### McCARTHY et al. v. TEXAS LOAN & GUARANTY CO. †

(Court of Civil Appeals of Texas. El Paso. Dec. 14, 1911. Rehearing Denied Jan. 10, 1912.)

1. CORPORATIONS (§ 399*) — AUTHORITY OF AGENT—PRESUMPTIONS.

An agent of a corporation employed to sell its corporate stock has authority to sell for cash only, unless the contract of employment authorizes an extension of credit to stock purchasers.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 399.*]

2. CORPORATIONS (§ 99*) — SALE OF STOCK — "MONEY PAID"—"PROPERTY ACTUALLY RECEIVED."

Under Const. art. 12, § 6, providing that no corporation shall issue stock, except for "money paid" or "property actually received," a contract for the sale of stock, to be paid for in part in cash and in part by the purchaser's notes, payable on a future date, is ultra vires, though the notes are to be indorsed by a solvent indorser and secured by a pledge of the stock, since a note is not the equivalent of "money paid," and since, as between the parties, a note is mere evidence of indebtedness, and is not "property actually received."

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 444–446; Dec. Dig. § 99.*

For other definitions, see Words and Phrases, vol. 5, pp. 4554–4565.]

3. CORPORATIONS (§ 99*)—SALE OF STOCK— MONEY PAID — PROPERTY ACTUALLY RECEIVED.

Sayles' Ann. Civ. St. 1897, art. 642, subd. 56, requiring stockholders of a corporation to

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

† Writ of error denied by Supreme Court.

subscribe at least 50 per cent., and pay in at least ten per cent., of the authorized capital before the corporation shall be authorized to do business, relates only to the prerequisites to incorporation, and does not regulate the issuance of stock, regulated by Const. art. 12, § 6, providing that no corporation shall issue stock, except for money paid, labor done, or property actually received.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 99.*]

Appeal from District Court, Harris County; Norman G. Kittrell, Judge.

Action by J. T. McCarthy and another against the Texas Loan & Guaranty Company. From a judgment for defendant, plaintiffs appeal. Affirmed.

O. T. Holt and L. M. Williamson, for appellants.  L. B. Moody, for appellee.

HIGGINS, J. Appellee is incorporated under the laws of Texas, with an authorized capital stock of $500,000 divided into 50,000 shares of par value of $10 each, and it is alleged that appellant L. P. Routt was the agent of the company, with authority to sell and dispose of its capital stock for the sum of $12.50 per share, and by virtue of such authority he contracted to sell to J. T. McCarthy (appellant) 25,000 shares of the stock for $312,500, payable as follows: $25,000 cash; a $50,000 note, payable in 4 months; two $100,000 notes, payable in 8 and 12 months; and one for $37,500, payable in 1 year. The three notes first mentioned were to bear 8 per cent. interest, to be indorsed by a solvent indorser, payable to appellee, and their payment was to be secured by the stock, in payment for which the same was given; the said stock to be issued in name of McCarthy and attached to the notes as collateral. The $37,500 note was payable to order of Routt, and represented the commission due him for making the sale. The notes and cash were tendered appellee, and demand made that stock be issued and attached to the notes, in accordance with the contract stated, which was refused, and this suit was brought by McCarthy and Routt to enforce performance of the contract, with an alternative prayer for damages for its breach.

[1] It is not alleged that the agency contract authorized Routt to extend credit to stock purchasers, and it will therefore be presumed that the contract itself authorized a sale for cash only. Horst v. Lightfoot (Sup.) 132 S. W. 761; Fitzhugh v. F. T. L. Co., 81 Tex. 313, 16 S. W. 1078. However, there are allegations in the supplemental petition which are, perhaps, sufficient to estop the company to deny that it had authorized Routt to make the contract upon terms indicated. The trial court sustained a general demurrer to the plaintiffs' pleadings, and dismissed the suit.

[2] It is insisted that the demurrer was properly sustained, because the issuance of corporate stock upon the terms indicated above is inhibited by article 12, § 6, of the state Constitution, which provides that: "No corporation shall issue stock or bonds except for money paid, labor done, or property actually received." Construing this clause, the Supreme Court, in San Antonio Irr. Co. v. Deutschmann, 102 Tex. 207, 114 S. W. 1176, used this language: "Section 6 of article 12 of our state Constitution reads as follows: 'No corporation shall issue stock or bonds except for money *paid*, labor *done*, or property actually *received*.' The term 'money paid' is very definite and plain, and does not mean that stock can be sold for money *to be* paid, but must be sold for cash. Of course, it can be paid for in installments, but it must be paid for in money, or in property actually received, or by labor actually performed for the company. The contract which Deutschmann sets up, by which he was not to pay for the stock any money at the time of its issue, is plainly and unquestionably in violation of the Constitution of the state, and being in violation of the Constitution that agreement, in so far as it provided that Deutschmann should have all the time that he might find necessary in which to pay for his stock, was void. * * * If the directors of the corporation had furnished Deutschmann with stock to be paid for at such time as he could arrange it, it would not have been a sale for 'money paid,' and would have been in direct violation of the Constitution."

This case is cited by both sides, and we confess it seems to us the language used conveys contradictory ideas, and we are unable to definitely determine just what the court meant. It says that the term "money paid" does not mean that "stock can be sold for money *to be* paid, but must be sold *for cash*," and yet in the next sentence it is said: "Of course, it can be *paid for in installments*." The apparent conflict in the language is, perhaps, explainable upon theory that the court meant that a subscription might be paid in installments, but that before the stock could lawfully *issue* it must be actually paid for. The provision quoted prohibits the *issuance* of the stock until paid for, and it may be that a stock subscription could lawfully be made payable in installments.

The question here presented has been directly passed upon in a number of other states, where similar provisions existed in the law or in the articles of incorporation.

Mr. Thompson, in his work on Corporations (2d Ed.) vol. 4, § 3940, says: "The subscriber cannot be said to pay for the shares subscribed by him by giving a written promise to pay—in other words, by giving his note—unless that is the agreement and intention of the parties, and *clearly within the*

*powers of the contracting parties.* When the corporation has the power to give credit, or to extend time of payment, and *there is no prohibition in the charter or governing statute,* it may ordinarily take the notes or bonds of the subscriber or a third person in payment."

In Leighty v. Turnpike, etc., Co., 14 Serg. & R. (Pa.) 435, the Supreme Court of Pennsylvania said: "Giving a promissory note for the sum which the charter requires to be paid in money is not a compliance with law. If such notes were to be taken as money, the policy of the law, which requires a payment of money, might be easily defeated."

In Boyd v. Railway Co., 90 Pa. 169, the same court in discussing validity of a stock subscription says: "One of the provisions [referring to act of 1849, regulating railroad companies] is that no subscription shall be valid, unless the party making the same shall, at the time of subscribing, pay the commissioners five dollars on each and every share, for the use of the company. The language is plain and emphatic, and the manifest object of the requirement was to protect the public against fictitious corporations with capital stock subscribed, perhaps, by irresponsible persons, and not a dollar thereof paid or intended to be paid in. * * * Giving a note for the amount was not a payment, within the meaning of the law. * * * A demand note, such as was given by plaintiff in error in this case, is not money; it is only a promise to pay money at a future date, and, perhaps, may never be complied with." To the same effect is Leighty v. Susquehanna, etc., Co., 14 Serg. & R. (Pa.) 434.

The California Civil Code has a provision in the precise language of the section of our own Constitution quoted above. In Jefferson v. Hewitt, 103 Cal. 624, 37 Pac. 638, a certificate of stock had been issued for a note of the subscriber. The court held the certificate void, basing its opinion upon that provision of the Code.

In Williams v. Brewster, 117 Wis. 382, 93 N. W. 483, it is said: "The purpose was to protect creditors. If stockholders can avoid its effect by giving their promissory notes for subscriptions for stock, by changing the mere evidence of their indebtedness, leaving the condition of the corporation, as regards ability to pay its creditors, the same as before, a very convenient way exists to enable corporations to pay dividends without any capital having been paid in, regardless of consequences. A construction of the statute that would permit such a practice, it seems, would convict the Legislature of putting upon the statute books an absurd piece of legislation. The words 'capital stock fully paid in' contemplate an actual payment of the subscription, not the mere giving of a promise to pay it. It need not nec-

essarily be paid in money, but it must be paid, not merely promised to be paid; the liability to the corporation be actually extinguished by an addition to its assets of either money or property of a money value, equivalent to the subscription indebtedness. Leaving out of view the value of the subscription liability as an asset of the corporation and of the stock as an asset of the subscriber, payment of capital to the corporation means adding something thereto that will make the corporation, to the extent of the liability extinguished, richer than before, and a subscriber for stock correspondingly poorer."

Prior to the adoption of our present Constitution, it seems to have been well settled in other states that a corporation could accept from a subscriber to its capital stock his note in payment therefor. See cases cited in note 3 Cook on Corporations (6th Ed.) vol. 1, p. 109. It was therefore possible for wholly irresponsible persons to form corporations of unlimited capital stock, without assets of substantial value, and it was, no doubt, the purpose of the framers of our Constitution to prevent such practices, and to insure to corporate investors the right which they have to assume that its actual capital, in money or money's worth, is equal to the capital stock which it purports to have. That corporate investors have the right to assume this fact is well established. Cook on Corp. (6th Ed.) par. 199. Under our own laws, many corporations are exempt from that provision of the statute which requires 50 per cent. of its authorized capital stock to be paid in cash, or its equivalent in labor done, or other property, before it can be chartered, and it is not unlikely that the appellee falls within the exempted class; and, if it be permissible to issue stock upon the basis contended for by appellants, some corporations could be chartered and its stock issued without any substantial assets whatever. The provision of the Constitution under consideration relates, not to the incorporation of corporations, but to the issuance of its stock, and we think its purpose was to prohibit the issuance of the stock until paid for; and we hold that the execution and delivery of the stockholder's promissory note is not payment, within the contemplation of the law, but a mere promise to pay. The fact that the notes to be given by McCarthy were to be indorsed by a solvent indorser and secured by a pledge of the stock does not in any wise affect the question. If it is permissible to accept notes at all, unsecured, as well as secured, notes could be accepted. Neither is the question affected by the fact that part of the subscription is to be paid in cash; for if a part cash payment meets the requirements of the Constitution, then there is no limit to the minimum cash payment that could be accepted, and to hold that a part cash pay-

ment would be sufficient in effect would nullify the Constitutional provision.

[3] Section 56 of article 642, Sayles' Ann. Civ. Statutes, has no bearing upon the question. In the first place, it could not nullify the Constitutional provision; and, secondly, it relates only to the prerequisites to incorporation, and in no wise undertakes to regulate the *issuance* of the stock.

We are fully aware that in actual practice corporate stock is often issued without compliance with this constitutional provision, and without regard to that general principle of corporation law to the effect that the public, in dealing with a corporation, has the right to assume that its actual capital in money, or money's worth, is equal to the capital stock which it purports to have, unless it has been impaired by business losses. The issuance of corporate stock as fully paid up before it has in fact been paid up is an ultra vires act, and has been a most prolific source of litigation, and the rights and liabilities of the parties arising out of such transactions pertain to another phase of corporate law entirely foreign to a determination of the question involved in the instant case; and under our interpretation of the term "money paid" we think the issuance of corporate stock, in consideration of the promissory note of the stockholder, is an ultra vires act and a contract to do so cannot be enforced. If such an ultra vires contract be performed and executed, the legal consequences arising therefrom, as stated above, are governed by established rules of law, which have no bearing upon a correct decision of the legality of the contract.

It is further contended that such notes are "property actually received," within the meaning of the Constitution. It is true a promissory note is "property" in one sense of the word, as, for instance, when it is in the hands of a third person. It has frequently been so held; but, as between the original parties to the same, it is but a mere evidence of indebtedness, and it would be a strained and unnatural interpretation of the Constitution to hold that it was there used in the sense contended for by appellants. To so hold would be to say that in one breath the organic law expressly refused to accept it as "money paid," and in the next breath permitted it under the guise of property, thus convicting the framers of the Constitution of a palpable inconsistency.

We therefore hold that the contract with McCarthy for the issuance of stock to him upon terms indicated was ultra vires; and it therefore further follows that no recovery for damages predicated thereon can be had by McCarthy or Routt for the refusal of the company to perform the contract. San Antonio Irr. Co. v. Deutschmann, supra.

The case is therefore affirmed.