PATTERSON, Commissioner of Insurance and Banking, v. ONION. (No. 7913.)

(Court of Civil Appeals of Texas. Dallas. March 9, 1918. Rehearing Denied April 6, 1918.)

1. BILLS AND NOTES ⬥⇒521 — ISSUING STOCK FOR NOTES—EVIDENCE.

Evidence *held* to show that stock of corporation was issued to defendant in consideration of the notes sued on, and not for money paid or property actually received within Const. art. 12, § 6, so that the notes were void as between the original parties.

2. BILLS AND NOTES ⬥⇒525—INNOCENT PURCHASER—EVIDENCE.

In suit by commissioner of insurance and banking on two notes, pledged as collateral to a bank in process of liquidation, *held*, under evidence, that notes were unenforceable; the bank not being an innocent purchaser without notice that the notes were executed in consideration of shares of stock, contrary to Const. art. 12, § 6.

Appeal from District Court, Dallas County; E. B. Meese, Judge.

Suit by John S. Patterson, as Commissioner of Insurance and Banking of the State of Texas, against John F. Onion. Judgment for defendant, and plaintiff appeals. Affirmed.

Robt. H. Rogers, of Waco, for appellant. Short & Field and John F. Onion, all of Dallas, for appellee.

TALBOT, J. This suit was instituted by John S. Patterson, as commissioner of insurance and banking of the state of Texas, in charge of the assets of the Farmers' & Merchants' State Bank of Waco, which bank was in process of liquidation, to recover of John F. Onion the amount of two notes for $2,500,

each dated March 15, 1913, and executed and delivered by the said Onion to the Texas Fire Brick Company, a private corporation. The notes sued on were payable on March 15, 1914, and September 15, 1914, respectively. On March 22, 1913, said notes, by what is termed a collateral agreement, were delivered and pledged by the Texas Fire Brick Company to the Farmers' & Merchants' State Bank of Waco as collateral to secure the payment of a note made by said company to said bank. After the institution of the suit, and before trial, Mr. Patterson died, and Charles O. Austin, his successor in office, was made the party plaintiff. The defendant Onion denied liability on the ground that the notes were executed for the purchase price of stock in said Texas Fire Brick Company, and because he had been misled and induced, by the false and fraudulent representations of said company's agent as to the character and value of its property and the amount of business it was doing, to purchase said stock and execute his notes therefor. At the conclusion of the introduction of the evidence the trial court instructed the jury, which had been impaneled to try the case, as follows:

"The evidence shows without contradiction that the notes sued upon in this action were executed in payment for 50 shares of the capital stock of the Texas Fire Brick Company, for which defendant subscribed, and that there was no other consideration for said notes. Said notes are not money paid nor labor performed nor property actually received, for which the shares of stock issued to the defendant could be taken in payment, and are therefore void under section 6, art. 12, of the state Constitution, and are not collectible even in the hands of an innocent purchaser. You will therefore return your verdict for the defendant."

The giving of this charge is said to be erroneous: (1) Because the evidence does not show without contradiction that the notes herein sued upon were executed in payment for stock in the Texas Fire Brick Company, but shows that said notes were executed as a part of a stock subscription contract between the defendant and said company, by which the defendant was bound before any certificate for stock in said company was ever filled out with the name of the defendant, or ever came into the hands of the defendant, and the charge is upon the weight of the evidence; (2) because the filling out of a certificate, as in this case, with the name of a subscriber for stock which has not been paid for, and having the certificate indorsed in blank by the subscriber, which certificate is to, and does, remain in the possession of the owner and holder of the note or notes given in evidence of the subscription for such stock, is not a violation of the law; (3) because it declares the notes herein sued on to be void, even in the hands of an innocent purchaser. These contentions of appellant are based upon an assumed state of facts which in neither instance is, in our opinion, warranted by the evidence. To quote the testimony in detail is, of course, impracticable.

There is, however, as we view it, practically no dispute or contradiction in it; and the applicable law seems to have been well settled by a number of decisions of our appellate courts. The notes in suit were executed by the appellee and the shares or certificates of stock purchased by him from the Texas Fire Brick Company were, according to the undisputed evidence, as we construe it, issued and delivered to him about the time of the signing of said notes, and the notes in turn taken in payment of the stock. The undisputed evidence, as we see it, further discloses that the notes in question were the only consideration for the shares of stock issued and delivered to appellee. After testifying that S. F. Kirksey, Jr., came to San Antonio, where appellee then resided, and solicited him to buy stock of the Texas Fire Brick Company, representing, in several days' negotiations, the financial condition of the company, what it owed, the money it had in the bank, the property it possessed, dividends it would pay, etc., appellee said that finally he agreed to take 50 shares of stock of the company and to execute his two notes in the sum of $2,500 each therefor, with the understanding and agreement that said shares of stock were to be delivered to him. He further said:

"These are the two notes (the notes sued on) I executed for that stock. * * * I received the 50 shares of stock. These notes were executed on my desk in the Gunter Building, San Antonio, Tex. When I executed those notes I received 50 shares of stock in the Texas Fire Brick Company. My recollection is the stock was received three or four days after the agreement was concluded; the certificate of stock was sent to me by mail with blank notes inclosed. When I received them there had been no agreement between us as to whether or not the stock should be put up as collateral security, but I had no use for the stock, and I voluntarily signed it in blank at the bottom without transferring it to anybody, but just signed it in blank."

There were two of the certificates of stock of 25 shares each. They bore the same date, and appellee testified that they were the certificates that were issued to him. He also testified:

"There was no consideration for the purchase of the 50 shares of stock represented by these two certificates other than these two notes that I executed. I demurred to taking the stock on the ground that I was investing in the San Antonio Life Insurance Company, and he (Kirksey, Jr.), said: 'Now all you have to do is to execute these notes payable on the dates shown here, and we will at once send you the stock.'"

On cross-examination the appellee stated that it was not his recollection that Mr. Kirksey brought the notes to him at his office; that Mr. Kirksey did not have with him the blank certificates of stock at the time he signed the notes; that there was a subscription blank signed by him; that the signing of the subscription document was the original part of the entire transaction. He said:

"At that time I signed nothing else but that subscription. I cannot fix the date of that, but I assume from these other things it was in

March, but I cannot tell the day. As I stated awhile ago, my recollection is that it was three or four days before the stock was delivered to me. * * * It is my recollection that those certificates of stock came to me through the mail after I signed the subscription contract, and I am pretty clear about this. The same mail that brought these certificates to me also brought these notes. * * * I do not recollect that those notes were brought to me by Mr. Kirksey. I have a distinct recollection of mailing them back to the company (Texas Fire Brick Company) in Dallas. Those notes were given in fulfillment of the stock subscription contract which I signed; they were given in payment of that stock. At the time the subscription contract was signed, I think the only man present was S. F. Kirksey, Jr. * * * He said he would deliver the stock to me, and all I had to do was to give him my notes. I do not know of any reason why the notes were not signed at that time. He didn't claim at that time to have the blank stock certificates with him; he merely asked me to sign the subscription contract, and said he would send the stock to me, and the notes were to be signed in payment of the stock."

On redirect examination appellee said:

"When I received the notes and the stock certificates, I signed the notes and signed the stock certificates in blank and sent them back to the company. They came in a letter from the company to me, and I sent them back to the company in a letter from myself to the company."

[1] The issue of stock generally means the issue of the certificate (Cook on Corporations, § 12), and it is doubtless true that such certificate is the mere representation of property, but it is the issuance and delivery of this representation of stock, except for money paid, labor done, or property received, that is prohibited by our Constitution. If issued in violation of the Constitution, such issue is void. That the testimony shows conclusively that the shares of stock involved in the suit were issued and delivered to appellee and became unequivocally his property, and that the notes sued on were executed by him and accepted by the Texas Fire Brick Company in payment for said stock in violation of article 12, § 6, of our Constitution, which provides that "no corporation shall issue stocks or bonds, except for money paid, labor done or property actually received," etc., cannot, we think, be seriously doubted. The case is clearly distinguishable in its facts from those cited and relied on by appellant. As we understand those cases it appeared in each of them, without contradiction, that the shares of stock were never issued and delivered to the purchaser. To review them and point out the particular evidence upon which they were decided would be of no real value, and only serve to lengthen unnecessarily this opinion. Some of the cases which have been cited by appellee sustaining the judgment of the district court and the conclusion reached by this court as expressed above are the following: San Antonio Irrigation Co. v. Deutschmann, 102 Tex. 201, 105 S. W. 486, 114 S. W. 1174; McCarthy v. Texas Loan & Guaranty Co., 142 S. W. 96; Mason v. First Nat. Bank of Point Rock, 156 S. W. 366; Insurance Co. v.

Curry, 183 S. W. 1; Republic Trust Co. v. Taylor, 184 S. W. 772. In the first case cited, the Supreme Court, after quoting the Constitution to the effect that "no corporation shall issue stocks or bonds except for money paid, labor done, or property actually received," said:

"The terms 'money paid' are very definite and plain and do not mean that stock can be sold for money to be paid, but must be sold for cash."

In McCarthy v. Loan & Guaranty Co., supra, in which a writ of error was denied, it was held that the provision of the Constitution under consideration relates not to incorporation, but to the issuance of stock, and that its purpose was to prohibit the issuance of stock until paid for, and that the execution and delivery of the stockholders' promissory note was not payment within the contemplation of the law, but more of a promise to pay. In Mason v. Bank, 156 S. W. 366, Mr. Justice Jenkins, speaking for the court, said:

"The sale of stock by a corporation is forbidden by the Constitution, except for money paid or property actually received. A note is not money paid, nor is it property within the meaning of said article of the Constitution."

In Republic Trust Co. v. Taylor, supra, it was shown that the shares of stock by agreement were deposited with the trust company by Taylor as collateral security for the payment of the note given therefor, and Mr. Justice Rasbury, speaking for this court, in regard to the question of the sufficiency of the issuance and delivery of the stock to the purchaser to constitute a violation of our Constitution, said:

"As security for the notes so given in payment of the capital stock the parties to the transaction recite that appellee (Taylor) has delivered to appellant the identical stock so purchased. There could not have been a delivery of the stock back to appellant without an issuance of the same."

With stronger reason it may be said in the present case that there could not have been a delivery of the stock purchased by appellee back to the Texas Fire Brick Company without an issuance and delivery of said stock by said company to appellee. Here there was no agreement or understanding that the stock was to be placed with the Texas Fire Brick Company as collateral security for the payment of the notes; and the deduction from the uncontroverted evidence is not only that the stock purchased by appellee was issued and sent to him by the brick company, but that it was issued and delivered without any agreement that it should be returned immediately to be held by said company as security for the notes sued on, or that it was expected that it would be returned for that or any other purpose. It is plain that the stock was issued and delivered to appellee in consideration alone of his notes, and not for money paid or property, within the meaning of the Con-

stitution, received. The contract was therefore void as between the parties to it.

[2] The question remains, Was the contract void and unenforceable as between the appellant and appellee? We think so. This is true in this case, even though it should be held that the principle of law announced is not applicable to an innocent purchaser for value. The appellant is in no better position to enforce the collection of the notes sued on than the Farmers' & Merchants' State Bank of Waco, whose estate he is administering, or the Texas Fire Brick Company, would be if either of them were suing. That the Farmers' & Merchants' State Bank of Waco was not an innocent purchaser of said notes, without notice that they were executed in consideration of the shares of stock sold and delivered by the brick company, is very clearly shown by the evidence. There is no room to doubt that said bank knew, or should be charged with knowledge of the fact, that the notes appellant is attempting to collect in this action had been executed by appellee in payment of stock in the Texas Fire Brick Company. M. E. Hulsey testified that he had been president of the Farmers' & Merchants' State Bank of Waco part of the time and cashier part of the time; that the notes sued on came into his possession as cashier of said bank; that they were attached as collateral security to a $15,000 loan that was made by the bank through him to the Texas Fire Brick Company in March, 1913; that Mr. Lastinger was vice president of the bank, and that his connection with it began at its organization and continued until April 1, 1913, at which time he severed his connection with it permanently, and said he was going to become connected with the Texas Fire Brick Company; that before Mr. Lastinger severed his connection with the bank, he made application for the $15,000 loan to the Texas Fire Brick Company, and that he (Hulsey) had authority to make it; that Mr. Lastinger, at the time the application was made for said loan, stated that the $5,000 notes of appellee, Onion, together with another note of $11,500 would be pledged to secure the payment of said loan. The witness Hulsey further testified:

"I don't recall that he (Lastinger) said what those notes of Mr. Onion's were given for, but it is my impression that they were given for stock in the Texas Fire Brick Company. * * * He had the notes with him, and the stock attached to the notes, and it was my impression that it was given for the stock. He told me that J. F. Onion (appellee) had signed the notes, and I investigated the makers of the notes before I made the loan. * * * At the time I made that loan, I knew that the collateral notes (of appellee) were given for an obligation Mr. Onion owed over at the Texas Fire Brick Company. I did not know for sure that it was for stock. * * * I don't recall whether the question was discussed as to whether the notes were given for stock or not. The stock was attached to the notes, and it would be natural that I would suppose that is what they were given for. The notes being attached to the stock, I would naturally get the impression that they were given for the stock."

The foregoing is the testimony of the representative of the Farmers' & Merchants' State Bank of Waco, who was authorized to and who did make the loan mentioned to the Texas Fire Brick Company, in part upon the pledge of appellee's note to secure the payment of said loan, and while it is true the bank's representative stated that he did not know for sure that the notes sued on were given for stock in the Texas Fire Brick Company, no reasonable and fair deduction can be made from it than that he clearly understood and was convinced, at the time the bank acquired possession of appellee's notes, that they were executed for the shares of stock purchased by appellee from the said company. We are unwilling to hold in the face of the foregoing undisputed testimony that the Farmers' & Merchants' State Bank of Waco was, and that the appellant through it became, an innocent purchaser and holder of the notes sued on without notice, etc. If, in fact Mr. Hulsey, the officer of the bank who received said notes for it, "did not know for sure" that the notes were given for stock in the brick company, it is manifest that the slightest inquiry would have disclosed that fact.

But, while we are not called upon to authoritatively determine in this case whether or not a note given in violation of our Constitution for corporate stock is void and unenforceable in the hands of an innocent purchaser for value without notice, it may be said that decisions of this and other states and elementary authority may be found affirming that it is. San Antonio Irrigation Co. v. Deutschmann, 102 Tex. 201, 105 S. W. 486, 114 S. W. 1174; Republic Trust Co. v. Taylor, supra; Kanaman v. Gahagan, 185 S. W. 619; Commonwealth B. & C. Ins. Co. v. Curry, 183 S. W. 4; Mason v. Bank, 156 S. W. 366, supra; Sturdevant v. Falvey, 176 S. W. 908; Ater v. Rotan Grocery Co., 189 S. W. 1106; Moss v. Bank, 102 Ga. 808, 30 S. E. 267; Williams v. Evans, 87 Ala. 726, 6 South. 702, 6 L. R. A. 218; Pomeroy on Equity Jurisprudence, § 940. Such seems to be the effect, if not the express holding, of the decision in Irrigation Co. v. Deutschmann, cited. In that case it is said that:

"A contract which is in contravention of the Constitution of the state, as the one under consideration, cannot give a right of action for damages or for any other relief in the courts of this state" (citing Moss v. Bank, supra).

It is also said in Deutschmann's Case that in Williams v. Evans, supra, the court construed a provision of the Constitution of that state which is almost in the same language of our Constitution upon the subject, and held that an agreement to issue stock in excess of the amount paid was in violation of the Constitution and therefore void. The rule is stated in the section of Pomeroy above cited as of universal application—

"that no action arises in equity or at law from an illegal contract; no suit can be maintained for its specific performance, or to recover the property to be sold or delivered, or the money agreed to be paid or damages for its violation."

It is clear to us that the judgment of the district court in this case should be affirmed; and it is so ordered.

Affirmed.

---

⚖⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes